**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SOUND OF MUSIC COMPANY,<br>an Illinois corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 99 C 0639 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| MINNESOTA MINING AND | ) | |
| MANUFACTURING COMPANY, | ) | |
| a Delaware corporation | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This parties in this case worked together for over two decades until their relationship ended in November 1997 when Minnesota Mining and Manufacturing Company ("3M") announced that it was exiting the background music business because of a "change in strategic business direction" and was therefore terminating its 1995 contract with all of its dealers based on a clause that allowed for termination in such circumstances. Sound of Music Company ("Sound of Music"), which was 3M's largest dealer of background music, was upset by this decision. It filed this lawsuit claiming that 3M was obligated under various implied and statutory duties to continue performing for a longer period of time.

Sound of Music also alleged that it had been enticed into signing the 1995 contract by promotional statements that supposedly gave the impression that 3M was committed to staying

in this business until at least sometime around the year 2005. Although this enticement theory was featured prominently in the original and subsequent complaints, it was never incorporated into a specific cause of action. In discovery, Sound of Music claims to have uncovered evidence linking these promotional statements to a larger fraudulent scheme. Specifically, when 3M issued these promotional statements, it supposedly had already decided that it would be exiting the business and intentionally kept this fact secret to lure Sound of Music and other dealers into signing the 1995 contract and purchasing expensive downlink equipment. Then, after the final payments on this equipment were made in 1997, it terminated the contract and then came up with a cover-up story, which was that its business was no longer profitable.

Before the Court is 3M's motion for summary judgment on the four counts in the current amended complaint as well as Sound of Music's motion for leave to file a second amended complaint adding a fifth count that seeks to incorporate this enticement theory into a fraud-based claim under the Illinois Consumer Fraud Act. This opinion will address both motions.

.                                  **BACKGROUND**[1]

Founded in 1902 by five men who had a single idea for starting a company, 3M is today a highly-diversified technology corporation with 20 billion in worldwide sales, over 67,000 employees, and more than 55,000 products. 3M has succeeded over the years by constantly developing new products. Some of these products, like Post-it notes and Scotch tape, are well-known to consumers today. But not all of its products have been as successful or as long-lasting. This dispute is about one of 3M's lesser known ventures.

---

[1] In summarizing the facts, we have relied upon and carefully reviewed the voluminous exhibits submitted by both sides. Sound of Music has submitted 51 exhibits, which are numerically-labeled, and 3M has submitted 24, which are alphabetically-labeled.

Sometime in the 1960s, 3M decided to enter the background music business. This business involves selling pre-recorded music to businesses that play the music in their stores. 3M decided to enter this business because, at that time, music was distributed on magnetic tapes, which was an area in which it had expertise. Although 3M reserved the right to sell this music directly to end users, it primarily relied on a network of non-exclusive dealers.

In 1973, Richard Cushing, who was then working for 3M, decided to leave the company and become one of these dealers. He founded Sound of Music and located it in Mundelein, Illinois. Much like 3M, albeit on a lesser scale, Sound of Music grew over the years from a small venture employing two people into a successful company employing 26 people and occupying five buildings. Its customers included Sears and True Value hardware stores. Cushing's two sons worked with him in this business, and he eventually hoped to hand it over to them. Unlike 3M, however, Sound of Music focused its energies primarily on one product and did not make significant efforts to diversify into other industries.

Over the next two decades, the technology in the background music business would change several times, forcing the parties to adapt and to make choices. The first of these changes occurred in the late 1980s when the technology changed from magnetic tapes to an analog satellite signal. This change forced 3M and its dealers to restructure their distributional system. On the front end, 3M had to find a way to send out a satellite signal, which it did by entering into an agreement leasing satellite space from a North Carolina company. On the back end, 3M had to provide a way for stores to receive this signal, which it did by distributing equipment, known as downlink equipment, that allowed end users to convert the analog signal into music that could be played in their stores.

## The 1988 Agreement

These technological changes led to legal changes. 3M entered into a new dealer agreement with Sound of Music and the other dealers in 1988. The 1988 agreement, though not directly at issue here, is nonetheless important in understanding the parties' concerns regarding the later 1995 agreement, which is the focal point of this lawsuit.

In the 1988 agreement, 3M agreed to lease this downlink equipment to dealers who would in turn sub-lease it to end users. (Ex. 3 at § I.) The price of the equipment was set forth on Schedule A that was attached to the agreement and included a one-time "entry fee" of $2,400 as well as other fees. These fees will become important later to the question of when the statute of limitations on the Illinois franchise act claim began to run.

This agreement did not contain a specific termination date, but it did allow for termination under four possible scenarios. (Section XIV.a-d.) Subsection "c" provided that 3M could terminate "immediately" upon written notice if "3M's Satellite Business is discontinued." Subsection "d" gave either party the option to terminate "regardless of cause" upon 90 days advance written notice. Although the agreement provided that 3M would lease the downlink equipment, the parties entered into a separate lease agreement. This agreement, unlike the 1988 agreement, had a specific termination date of 60 months from its inception.

In 1991, Sound of Music became concerned about whether the 1988 agreement gave it an exclusive right to sell in the six-county area identified in the contract as its primary selling area. Cushing asked Edwin Josephson, a partner in the Chicago law firm Chuhak & Tecson, to review the 1988 agreement and analyze this issue. Josephson informed Cushing that it was his opinion after reviewing the agreement that 3M did have an explicit right to sell directly to end users in

Sound of Music's selling area.  (Ex. W.)  This conclusion was based on a review of the agreement as well as Schedules B and C that were attached to the it.  Although Sound of Music apparently did not pursue this issue with 3M, we mention it because it shows that both Cushing and Josephson were familiar with the terms of this agreement.

### 3M Terminates the 1988 Agreement

In 1993, dealers became concerned about what would happen with the downlink equipment given that the 60-month lease agreements would expire later that year.  (Ex. C.)  3M then decided (for reasons that are not clear) to shift to a system whereby dealers would purchase, rather than lease, the equipment.  (*Id.*)  To implement this change, 3M terminated the 1988 agreement in a letter dated October 14, 1993.  (Ex. 6.)  3M relied on the clause allowing for termination without cause upon 90 days' notice.  Although 3M terminated this agreement, it told dealers that it wanted to enter into a new contract and sent them a proposed agreement at the same time.  (*Id.*)

Sound of Music, as well as other dealers, were upset that 3M had terminated the 1988 agreement in what they considered to be an abrupt manner.  Sound of Music again contacted Josephson and asked him to look into the matter.  After researching legal grounds for challenging this termination, Josephson wrote to 3M on November 18, 1993 and asserted that 3M's unilateral termination was improper and violated "contractual obligations of good faith" and also violated, in certain states, "statutes regarding fair treatment of dealers." (Ex. V.) Josephson indicated that he was not only representing Sound of Music but also a substantial group of other dealers and that they had retained him to negotiate the terms of a new agreement. Josephson told 3M that the proposed agreement was unacceptable.

Beginning in the last quarter of 1993, 3M and these dealers began negotiating the new agreement, a process that would take over a year and a half to complete during which time the parties continued working together in apparently normal fashion. It is clear that both sides thought the 1988 agreement needed to be changed in ways that would more protect their interests.

In the proposed agreement sent out by 3M, which was nominally in the same format as the 1988 agreement, 3M had already made some significant changes. It inserted, for example, a clause stating that the dealer " is not an agent, partner, involved in a joint venture with *or a franchisee* of 3M . . . ." (Ex. 6; emphasis added.) Also added was a provision selecting Minnesota law as the choice of law and a binding mediation/arbitration clause. The agreement also included a buy option for the downlink equipment in addition to a lease option; later in the negotiating period, 3M deleted the lease option, which Sound of Music believes was done as part of the alleged fraudulent scheme.

With regard to the termination section, which is critical to this lawsuit, 3M's proposed agreement contained a termination date of December 31, 1998, which was later changed to December 31, 1999. This meant that, unlike the 1988 agreement, this agreement would expire on its own terms after approximately five years. 3M also included the same framework of early termination clauses that were in the 1988 agreement. However, apparently in response to concerns by dealers, 3M softened these clauses by eliminating the provision allowing for termination without cause and by adding a requirement that it must give 90 days' notice under the exit-the-business clause. The 1988 agreement, in contrast, allowed 3M to terminate immediately in this situation.

Sound of Music and the other dealers had a number of concerns.  Having just been terminated without warning under the 1988 agreement, Cushing was concerned about "how long [3M would] be in this business."  (Ex. A at 45.)  He also was worried that 3M was "posturing [itself] to exit rather than grow the business."  (*Id.* at 47.)  Cushing also worried that 3M might take over Sound of Music's big accounts and sell directly to end users, which was the same issue which he was concerned about in 1991.  (*Id.* at 57.)

In an effort to protect themselves from some of these risks, Sound of Music and the other dealers worked together to negotiate terms that would protect them.  They were partly, though not entirely, successful.  They were able to get some concessions from 3M because of the possibility of a "dealer revolt."  (Resp. Br. at 6.)  Cushing was particularly concerned about the exit-the-business clause because he knew that, if 3M only needed to give 90 days' notice, Sound of Music would be in a bind because it generally had 5-year contracts with its customers.  (Ex. A. at 60.)  Cushing therefore wanted this clause to require 60 months' notice, which would have effectively eliminated the effect of this clause because the contract itself only lasted 60 months.  But 3M was not willing to agree to this longer time period and the parties ultimately agreed to something in the middle.  3M would have to give 12 months' advance written notice if it exited the business.[2]

Insofar as we can tell, Sound of Music was worried primarily about the exit-the-business clause.  It is not clear whether it tried to get 3M to agree to a longer duration period beyond the five-year time period or to agree to any kind of automatic renewal provision of this contract.

---

[2]Sound of Music was also able to get 3M to agree to not solicit any new business from Sound of Music's True Value and Sears accounts for a period of six months.  This change was handwritten onto the document.  (Ex. A at 65; Ex. B at 1.)

There is also no evidence as to whether Sound of Music made any objections to, or attempts to change, other terms such as the choice of law provision or the clause waiving franchise rights.

### Why Did Sound of Music Enter Into The 1995 Agreement?

Although Sound of Music was able to negotiate some changes in the agreement, it still wasn't happy and felt that it was only able to get "very limited negotiation."  (Cushing Dep. at 71: "we weren't happy with it.  We wanted 60 months.").  Despite these concerns, Sound of Music nonetheless signed the new agreement on May 5, 1995, and also contemporaneously entered into an installment contracts in which it agreed to buy approximately $600,000 worth of downlink equipment.

At this point, an important question arises – one that will be central to the resolution of this lawsuit.  Why did Sound of Music enter into this agreement if it was concerned that 3M was "posturing" to exit the business, if it knew that 3M could do so by giving only 12 months' notice, and if such an early termination of the contract would cause problems with its contracts with end users?  After all, Sound of Music had just experienced an unexpected and unwanted termination of the 1988 agreement.  Sound of Music's belief that 3M was posturing to exit the business shows that it had a strong suspicion *at this time* (which is important to remember when we discuss the fraud-based claim) that 3M would exit the business.  Sound of Music asked 3M to lengthen the notice period on the exit-the-business clause, but 3M wouldn't extend it beyond 12 months.  Despite all these warning signs, Sound of Music signed the agreement.

No doubt realizing the importance of this question, Sound of Music has spent a significant portion of its lengthy response brief trying to answer it.  In fact, it offers two separate explanations.  The first one is a duress argument, which is that it was "forced" by 3M to sign the

agreement. We'll discuss this theory further in Section I below. The second is the enticement

theory mentioned in the beginning of this opinion. Sound of Music states that it was "enticed"

and "assured" by both oral and written representations 3M made during the negotiation period.

As for the oral representation, Cushing stated in his deposition that, despite his worries

about 3M exiting the business, he entered into the agreement because some unnamed person at

3M told him "don't worry" about the contract because it was "just some legal matter that has to

be done":

> [W]e were concerned that – how long will they be in this business? And after our
> concerns, we were assured by the management of 3M that, "We are in this
> business to stay and we are going to be in this business a long time. And don't
> worry about anything. It's just some legal matter that has to be done." And when
> you look back at all of what has happened, this – this was the plan. They were
> going to exit this business, and we, again, believed in them, and the loyalty that
> we had with them said, "Okay. Fine. Let's continue on, and let's do business as
> [] usual.

(Ex. A at 45.)

As for the written representations, Sound of Music claims that 3M made statements in

promotional literature sent out to dealers and customers during this general time period (between

1993 and 1995) that gave the impression that 3M was committed to staying in the business until

at least 2005. Sound of Music has submitted numerous examples of these statements, which

consist of letters and marketing materials, some of which were prepared for end users such as

True Value. *See, e.g.* Exs. 10, 14, 15, 16, 17, 19, 20. Although the wording varies slightly in

each statement, only really two basic representations are at issue. First, 3M informed dealers and

end users that it had recently signed a new satellite contract for space on the Galaxy IV satellite,

which had "a projected orbital life to the year 2005." (Ex. 15.) No one disputes that this was a

true statement. Second, usually in conjunction with this first statement, 3M sometimes also

stated that this new satellite contract meant that 3M was prepared to "move forward into the twenty-first century." (*Id.*) The following quotation from a December 10, 1993 letter provides a good example of both types of statements:

> I am pleased to announce that 3M has signed an agreement to provide satellite space on a replacement satellite with a projected orbital life to the year 2005. Further details will be forthcoming, but we are well positioned to move forward into the twenty-first century.

(*Id.*)[3]

### 3M Terminates The 1995 Agreement

About two and half years after the contract was signed, on November 18, 1997, 3M informed Sound of Music and other dealers that it had been "carefully evaluating" its satellite background music business for the "past several months" and had decided that "a change in strategic business direction is necessary" and that it was therefore terminating the dealer contracts effective December 31, 1998 based on the exit-the-business clause. (Ex. 24.)

We now are at the point in the factual summary where the parties diverge most sharply. The question is *why* and *when* did 3M decide to get out of the business. This relates to the allegation of fraud. 3M says that it first considered exiting the business only a few months before it actually did so (*i.e.* in the fall of 1997) and that the decision was a good faith business judgment. Sound of Music believes that 3M "concocted" a "massive deceptive or false advertising campaign" to lure dealers into signing the 1995 agreement. (Resp. at 9.) Sound of

---

[3]*See also* Ex. 16 ("As announced at our dealer meeting, we have signed an agreement to provide satellite space on Hughes Galaxy IV, a satellite with a projected orbital life to the year 2005."); Ex. 17 ("This satellite has an extended life to the year 2005."); Ex. 20 ("With satellite broadcast, 3M offers music quality capabilities never before possible and options to take business communications into the next century . . . today.") (ellipse in original).

Music believes that the 3M's later explanation of its decision to exit the business, which is contained in the Will report, was merely a charade designed to make it *look like* the decision was being made in 1997 when it had already been made several years earlier.

Although the parties offer sharply contrasting theories, they do not disagree about the basic underlying facts, which will be summarized here and then analyzed in more detail in Section III. To understand this issue, we need to explain how this business fit within the bigger picture at 3M.

This business, which went by various names and was sometimes called DBS Sound Products, was undeniably a very small component of a company that had over 55,000 products. One witness said that it would have been referred to as a "project" within 3M because it was "a very small business." (Ex. G at 21.) In 1991, 3M announced that this business was being placed within a 3M's National Advertising division ("National Ad"), which consisted of products under the general label of "out-of-home advertising media" that included interstate outdoor advertising bulletins, 30-sheet posters, and shopping mall advertising. (Ex. 5.) This move was done in an effort to create product synergy because 3M believed that the background music business would "mesh well" with the other businesses in this division. (*Id.*)

In this same announcement, 3M stated that Ed Shivitz was being appointed as the new product manager for the background music business. (*Id.*; Ex. F at 13.) In 1995, Shivitz was promoted and Arnie Roese then headed the business from late 1995 until he was transferred to Europe in the late summer of 1997.

Sometime around the time Roese left for Europe, 3M decided to sell the National Ad division. This decision was not based on the lack of profitability, as this division was actually

producing strong revenues at the time, but was instead due to the failure of the division to achieve its goal of "strong product synergy." *A Century of Innovation*, First Ed., at p. 200 (2002), *available at* http://solutions.3m.com (last visited August 15, 2005).

Although 3M sold the National Ad division of which the background music was a part, the background music business and a related wireless intercom business were retained by 3M. (It is not known whether these businesses were retained because the buyer did not want them or because 3M did not want to sell them.) Having retained these two businesses, 3M then had to decide where in the company to put them. It temporarily put them in the Food Services division, which was headed by Dr. Gabriel Sabongi who was a chemist by training and who had no experience in the background music business. (Ex. G at 6-8.)

Shortly after inheriting these businesses, Sabongi was asked by Ray Richardson, a 3M vice president, to look at their financial health. (*Id.* at 17.) Unfortunately, because Richardson was not deposed in this case, we do not the exact reason why he asked Sabongi to look into this issue. Sound of Music speculates that his request was part of the pre-arranged fraudulent scheme and was an effort to provide a cover story. As we will explain below, the circumstances and timing point to a different (and non-fraudulent) explanation for the decision.

Sabongi asked Don Will to analyze this issue and to prepare a report. Will was a logical choice for the task. He was the operations manager and had been involved in this business since 1988, creating all of the programs for satellite services. (Ex. H at 13; Ex. A at 30.) Will worked with Gary Wiese, Katie Mehlhorn, and John Barkholtz in preparing the report. Wiese and Mehlhorn also had been involved in the this business for some time and understood its "ins and outs very well." (Ex. H at 21.)

According to Will, Sabongi explained that his superiors had asked him to evaluate what to do with this business and whether, for example, to keep and grow it or do something else. (*Id.* at 22.) One of the first decisions made by Will and his team, however, was that keeping the business was not feasible because of a looming shift in the industry to digital satellite technology. The Will team believed that 3M's competitors had already begun the process of moving to digital services, which was causing a "continual but increasing erosion" of 3M's business as "[d]ealers were [] defecting to the new digital systems." (*Id.* at 43-44, 230.) Based on these facts, the Will team thought it was "patently" obvious that keeping the business was not an option. (*Id.* at 213.)

The only question then was when the business would be shut down. After analyzing the issue, the Will team prepared a lengthy report that discussed three options: divestment or selling the business, a fast one-year shutdown, and a slow harvest. (Ex. I.) The divestment option was ruled out immediately because the 3M legal department allegedly stated that no buyers existed that could meet 3M requirements. (*Id.* at MM 0481.) The choice then was really only between the latter two options.

The report ultimately recommended the one-year shutdown option. The "deciding factor" was that a slow harvest shutdown would create an "end game scenario" because re-negotiation of the satellite contract would have to take place several years before 2005 and dealers would want a commitment at that point that 3M was staying in business past 2005. (*Id.* at MM 0493.) In other words, 3M would be in a lame duck status and would occur a "sizeable shutdown cost beginning in 2003" when dealers would start to defect over to other dealers. (*Id.*

at MM 0481.)  The report estimated that the loss in the last three years leading up to 2005 would be up to $16 million.

But this decision was not easy, as each option had its pluses and minuses.  Under the one-year shutdown option, 3M would have to buy out the satellite contract which, unlike the 1995 agreement, did not have an exit-the-business clause.  Under this contract, 3M was committed to making annual payments of approximately $1.5 million until the year 2005.  On the other hand, 3M currently had some funds in escrow from the sale of National Ad which could be used to offset these costs, and these funds would be unavailable in 1999 or after.  (*Id.*)  Another factor that Will's team considered was the effect that a shutdown of the background music business would have on the related intercom business, which was not being shutdown but which had a similar customer base.  3M's decision came after careful analysis of all these factors.

The report was forwarded to Sabongi who agreed with the recommendation and then sent it "upstairs" to corporate operations.  According to Sabongi, someone higher up, perhaps Richardson, agreed with the recommendation of Will and his team.

### Sound of Music Reacts To The Termination Letter

Three days after receiving the termination letter, Sound of Music called Josephson who asked a law clerk to research possible legal claims.  Over the next several months, the clerk researched and wrote three memoranda analyzing possible causes of actions, including fraudulent inducement, RICO, and breach of contract claims.  (Exs. P, Q, R.)  However, none of these memos discussed a possible franchise act claim.

Over the next four months, from approximately December to March 1998, Sound of Music explored options for what to do.  Most of its effort was spent on trying to work out a deal

whereby it and other dealers would take over the 3M business in a co-operative agreement. Several meetings and conversations ensued. Sound of Music contacted the satellite provider, with permission from 3M, and discussed arrangements for taking over the contract. However, after carefully assessing all the relevant factors, Sound of Music concluded that this option was "too much of a high risk venture without 3M's help and financial assistance." (Ex. 40.)

Having exhausted this option, Cushing then sold Sound of Music to Muzak on April 13, 1998. In return, Cushing received money and an interest in a Muzak franchise in Milwaukee. The parties disagree on the value of this transaction. 3M asserts that the total value of compensation paid was over $7.2 million. Sound of Music responds that the value was actually around $1.6 million because it had to pay off loans of $1.4 million that were taken out to buy the equipment from 3M. (Ex. A at ¶ 22.) It complains that the it did not recoup the real value of the business because Muzak was the only purchaser available and thus bought the business at a discounted price.

On February 2, 1999, Sound of Music filed this lawsuit. Discovery was delayed for a significant period while the parties attempted to mediate their dispute as was required by the 1995 agreement. Sound of Music later filed an amended complaint, asserting four claims: (i) breach of the Illinois franchise act; (ii) breach of the Minnesota franchise act; (iii) equitable recoupment; and (iv) breach of contract. After discovery closed, 3M filed the present summary judgment motion. Shortly after 3M's opening brief was filed, Sound of Music filed its motion for leave to file a second amended complaint.

<u>**ARGUMENT**</u>

**I.**     **Overview And Preliminary Considerations.**

Although Sound of Music is asserting numerous claims with different legal theories and elements, its claims are all directed at the same basic point. Sound of Music believes that 3M terminated the 1995 agreement *too early.* The agreement was terminated effective December 31, 1998, but Sound of Music believes that 3M should have continued performing for a longer period of time.

How long? The answer varies depending on which legal theory is being asserted. In the first two claims, which are under the Illinois and Minnesota franchise acts, Sound of Music alleges that 3M could never terminate this relationship based on a decision to exit the business. In other words, 3M was stuck in this agreement forever – or, at least, until Sound of Music decided it wanted to get out of it. In the third claim, which is a claim for equitable recoupment, Sound of Music alleges that 3M had to stay in this business until Sound of Music recouped its investment. Sound of Music does not state how long this would take. In the fourth claim, which is a breach of contract claim, Sound of Music asserts two theories. One is that 3M did not have a legal basis for invoking the exit-the-business clause. If so, then the contract would have remained in force for an additional year and would have expired on its own terms one year later. The other theory rests on the implied duty of good faith and fair dealing. 3M was supposedly obligated to wait for some period of time before it invoked the exit-the-business clause. Sound of Music does not tell us how long this time period would be.

In the proposed Consumer Fraud Act claim, Sound of Music seeks to recover the lost value of its business due to the early termination. Sound of Music, once again, does not say how

long this period would be. However, because this claim incorporates Sound of Music's enticement theory, Sound of Music is apparently seeking lost profits it would have made until sometime around the year 2005.

With the exception of the first theory under the breach of contract claim, which is clearly unavailing as we will explain below, all these theories seek to extend the duration of the contract *beyond* the time period explicitly negotiated by the parties and clearly set forth in the 1995 agreement. We will examine below whether these specific implied and statutory duties provide a legal basis for doing so. But it is important to make clear at the outset what Sound of Music wants to achieve in this lawsuit. It wants to change the duration term in the 1995 agreement, while leaving all the other terms in place. To state it yet another way, Sound of Music is asking this Court to re-write the parties' bargain so that it may achieve through this lawsuit something it tried to, but was unable to, achieve in its negotiations with 3M.

When the issue is framed in this manner, it is clear that Sound of Music faces an uphill battle in this lawsuit. Sound of Music undoubtedly recognizes this fact because it has tried hard in its response brief to create the impression that the 1995 agreement was unfair and was the product of duress. The implied suggestion seems to be, given that there is no formal duress defense being asserted here, that this Court should feel free to alter the terms of the parties' agreement. Because this suggestion lingers in the background and tends to undermine the legitimacy of the 1995 agreement, it is important to briefly explain why this duress argument is neither legally nor factually justified.

Sound of Music claims that the 1995 agreement was "one-sided" and "onerous" and that it signed the agreement because it had "little financial free will." (Resp. at 6; Am. Cmplt. at ¶

16.)  Cushing goes even farther and alleges in his affidavit that 3M pressured and threatened it.  However, Sound of Music has come forth with no evidence suggesting that 3M took any improper steps to force Sound of Music into signing the agreement.  This fact alone would rule out any duress claim.  *See Kaplan v. Kaplan*, 182 N.E.2d 706, 709 (Ill. 1962) (to establish duress under Illinois law, plaintiff would have to show that he was "induced by a wrongful act or threat of another to make a contract under circumstances, which deprive him of the exercise of his free will").

Instead, the duress allegation rests solely on Sound of Music's assertion that it was forced by the circumstances into signing the agreement and had no other viable option.  The facts, however, do not support this assertion.  First, Sound of Music was not a powerless participant in these events.  It was the largest 3M dealer.  It had years of experience in this industry and specifically much experience in dealing with 3M.  It banded together with other dealers to enhance its bargaining power.  It was represented by counsel who had experience in this area.  It was able to get 3M to change provisions in the agreement.  3M dropped the clause allowing it to terminate without cause.  3M lengthened the notice period in the exit-the-business clause.  3M even made a special concession to Sound of Music by agreeing not to solicit several big accounts for six months.  This was thus not a "take it or leave it" deal as Sound of Music suggests and it undeniably had *some* bargaining power even though, as is often the case, it wished it had more.  *See Castellano v. Wal-Mart*, 373 F.3d 817, 820 (7th Cir. 2004) (a "hard bargaining position" does not constitute duress).

Second, Sound of Music in fact did have other options.  In particular, rather than signing the 1995 agreement, it could have switched to one of 3M's competitors.  Sound of Music has

repeatedly complained in this case that 3M was less generous than competitors who supposedly, unlike 3M, gave their dealers protection under franchise laws.  *See* Resp. at 6.  We know from the Will report that 3M was specifically concerned about the ongoing possibility that dealers "may convert" to AEI especially since most of them were already AEI distributors.  (Ex. I at MM 0491.)  This point is also confirmed by Cushing who stated in his deposition:  "[w]e had many opportunities to go to other companies, but we felt allegiance to 3M."  (Ex. A at 22.)

In short, contrary to Sound of Music's claim that it had no choice, the undisputed facts show that it had a choice, that it fully considered the pros and cons of the 1995 agreement, and that it then made a voluntary choice to sign that agreement and to therefore accept the risks associated with that decision.

## II.     The Four Counts In The First Amended Complaint.

### A.     Breach Of Contract (Count IV).

#### 1.     The Textual Argument.

In terminating the contract effective December 31, 1998, 3M relied on the exit-the-business clause in § 15.D, which states that the agreement may be terminated "by the parties . . . upon 3M's exit from the business by sale, divestiture, assignment of assets, or any other manner of exit, or any other material transfer of ownership of the Equipment or Music Service portion of either Party's business upon twelve (12) months' advance written notice." Sound of Music makes two textual arguments as to why 3M's reliance on this clause was improper:  (i) the clause was only for Sound of Music's benefit, and (ii) 3M in fact did not exit the business.[4]

_____

[4]The parties do not discuss the issue of what law should be applied but instead proceed under the assumption that Illinois law applies.  However, the contract contains a broad choice of law provision that stipulates that Minnesota law will apply to any "questions, claims, disputes or

As for the first argument, the agreement states that the clause can be invoked "by the parties."  Focusing solely on this language, it clearly does not contain any explicit limitation on which party may use it. Sound of Music believes that the meaning of this phrase becomes clear, however, if this section is compared to another termination clause.  Section 15.B provides for termination if one party files for bankruptcy, institutes proceedings for the winding up of business, or takes other similar actions.  This section explicitly states that only the "other party" (*i.e.* the non-acting party) may rely on the clause.  Sound of Music then argues that, since exiting the business and winding up a business are roughly the same thing, these two sections should be interpreted similarly.

This argument violates established rules of contract interpretation.  The fact that one section in a contract includes a specific right and another section in the same contract fails to include that same right leads to exactly the opposite inference sought by Sound of Music.  It shows that the drafters of this agreement knew how to draft a termination clause that could be invoked only by one party and that their failure to include such a clause in §15.D is intentional. *See Brookfield Trade Ctr. v. County of Ramsey*, 584 N.W.2d 390, 395 (Minn. 1998).

Sound of Music's argument also wrongly assumes that these two situations are the same. Section 15.D addresses a private decision to voluntarily go out of business and requires 12 months advanced written notice.  Section 15.B, in contrast, is tied to a clearly demarcated and publicly observable event such as the *filing* of bankruptcy or the *institution of proceedings* for the winding up of business.  From an operational point of view, § 15.D would not make sense if

---

litigation arising from or related to this Agreement."  (Ex. B at § 22.)  Therefore, we will apply Minnesota law, although the result would be the same under Illinois law.

it could only be used by the non-acting party.  How would Sound of Music be able to give 12 months *advanced* notice of 3M's decision to exit the business?  This issue does not arise with § 15.B, which does not require advance notice.

Even if we were persuaded by these arguments, at best they would create an ambiguity, which would then require an examination of the extrinsic evidence to determine the parties' intent.  *City of Virginia v. Northland Office Props.*, 465 N.W.2d 424, 427 (Minn. App. 1991). This evidence is unequivocal, which explains why Sound of Music never attempts to rely on it. As summarized above, in the negotiations over the 1995 agreement, Sound of Music tried its best to get the notice period in the exit-the-business clause lengthened.  It was unhappy that it could only get it extended to 12 months rather than 60.  The undeniable underlying assumption is that it believed that 3M had the right to invoke this clause.  This interpretation was also held by Sound of Music's attorney who believed at the time that this clause "put [his] client in a very serious condition[.]"  These facts make no sense if, as Sound of Music now claims, 3M had no right to utilize this clause.

Second, Sound of Music argues that 15.D's reference to exiting the "business" does not apply because 3M itself (meaning the entire world-wide, 55,000-product global conglomerate) did not go out of business.  This interpretation is an unnatural reading of the contractual language and one that is undermined both by common sense and by the extrinsic evidence just discussed above.  Moreover, it is specifically undermined by Cushing who was unequivocal in his deposition:  "As far as I'm concerned, 3M is out of business."  (Ex. A at 72.)

## 2.     The Duty Of Good Faith.

Under Minnesota law, "every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin County*, 540 N.W.2d 494, 502 (Minn. 1995).  This duty does not apply here because a party may not rely on this duty to alter an explicit and clear contractual term.  *See Best Vendors Co. v. Air Express, Inc.*, 2002 WL 31163039, *6 (D. Minn. Sept. 23, 2002) (because contract spelled out "clear grounds" for termination, which was 20 days written notice for any reason, duty of good faith did not apply); *see also Resolution Trust Corp. v. Holtzman*, 618 N.E.2d 418, 424 (Ill. App. Ct. 1993) ("Parties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith.").

### B.     Equitable Recoupment (Count III).

For the same reason that the duty of good faith fails, the equitable recoupment claim also fails.  Under Minnesota law, this claim may only be asserted where, unlike here, the contract contains no term addressing duration.  *See Best Vendors Co.*, 2002 WL 31163039 at *7-8 (summarizing cases).  As the Eighth Circuit has explained, this holding makes sense because otherwise "recoupment becomes a device by which judges may rescue a party from its bad bargain by taking money away from the other party."  *Retail Assocs. v. Macy's East, Inc.*, 245 F.3d 694, 698 (8th Cir. 2001) (discussing both Minnesota and New York recoupment law).

This claim also fails for the additional reason that Sound of Music has already recouped its investment when Cushing sold the business to Muzak.  Sound of Music admits that it has recovered its expenses.  It paid off its loan on the downlink equipment.  It is thus seeking to recover lost profits that it would have made if the contract had continued.  But these damages are

not recoverable in a recoupment claim. *Schultz v. Onan Corp.*, 737 F.2d 339, 348 (3d Cir. 1984) ("Recovery for future profits is prohibited because recoupment is an equitable doctrine intended to restore the franchisee's lost investment, not to award damages at law for the going value of the business.").

C.     **The Illinois Franchise Act Claim (Count I).**

Sound of Music alleges that it was a franchisee and that 3M therefore could only terminate the parties' relationship if it had "good cause" to do so. Sound of Music further alleges that 3M's decision to exit the business cannot constitute good cause *even if* it was made in good faith and not a part of a fraudulent scheme.

3M raises numerous arguments in response. It argues that Sound of Music does not meet the definition of a franchisee because it did not pay any franchise fee; that the claim is barred by the one-year statute of limitations; and that exiting the business entirely constitutes "good cause" under the statute. Finding that the statute of limitations argument is dispositive, as explained below, we will not address the other arguments in favor of summary judgment.

Under the Illinois Act, as applied to the facts in this case, Sound of Music was required to file this lawsuit within one year after it became "aware of facts or circumstances reasonably indicating that [it] may have a claim for relief." 815 ILCS § 705/27. In *Pyramid Controls Inc. v. Siemens Industrial Automation, Inc.*, 172 F.3d 516 (7th Cir. 1999), the Seventh Circuit considered this language and the Illinois cases interpreting it and concluded that a franchisee need not have "actual knowledge" of a claim in order to trigger this limitations period. Instead, all that is required is "knowledge of facts reasonably indicating a claim plus consultation with an attorney." *Id*. at 519. Relying on this case, 3M argues that the limitations period began to run in

this case in November 1997 because that is when Sound of Music received the termination letter and when, three days later, it consulted its attorney who then looked into possible legal causes of action over the next two months. Sound of Music waited until February 2, 1999, approximately 14 months after this time period, to file this lawsuit.

In response, Sound of Music does not deny these facts, but instead argues that, although Josephson looked into the issue over a several-month period, he did not become aware of the franchise act claim because he "had no idea that there was a franchise fee at that point." (Ex. J at 104.) Why? Because these fees were allegedly "hidden" and "disguised." Sound of Music goes further and says that 3M intentionally deceived Sound of Music by going "to great lengths to disguise" these fees. (Resp. at 23.)

Sound of Music further explains that these franchise fees were only discovered when other lawyers at Josephson's firm later "reviewed thousands of documents going back to the year 1988." (Ex. 42. at ¶ 12.) This document review took place sometime around April 1998. (*Id.* at ¶¶ 11-12.) Although Sound of Music does not disclose how long *in fact* it took these *other attorneys* to discover these fees, it proceeds under the assumption that it would take a *reasonable attorney* "more than two months" to review this many documents and then to figure out that a claim existed. (Resp. at 23.) According to this logic, Josephson was reasonable in not discovering these fees in the two month period in which he looked into the matter.

This argument fails because, contrary to the impression created by Sound of Music, these putative franchise fees were far from being hidden and in fact were right out in the open. Where were they? In the 1988 agreement. To be more specific, the body of the agreement generally referred generally to a pricing schedule (Schedule A) that was attached, and this schedule set

forth the $2,400 one-time fee and the monthly dealer reception fees that Sound of Music claims are franchise fees. It is hard to understand why Sound of Music believes these fees are hidden. It is not as if we are dealing with lengthy documents. The 1988 agreement is 7 pages long; Schedule A is one page. Nor is this an obscure agreement. Next to the 1995 agreement, it is the probably the most prominent document in this case. Thus, even if there were thousands of documents, you would expect that this would be one of the first ones you would pick up.

But it is not as if Josephson was unfamiliar with this agreement. Although his affidavit gives the impression that he first began representing Sound of Music in 1995,[5] we know that his representation began much earlier and that he specifically reviewed the 1988 agreement on multiple occasions. He looked at it, including specifically two of its schedules, in 1991 when Cushing asked him for legal advice about whether the selling area was exclusive (Ex. W); he looked at it again in 1993 when Cushing asked him to research legal grounds for challenging 3M's termination (Ex. V); and he almost certainly had to refer back to it when he helped negotiate the 1995 agreement.

Not only was Josephson familiar with this agreement and the parties here, he also had experience with franchise issues. In 1991, he represented another client in a franchise dispute. (Ex. W.) In 1993, he researched possible causes of action for the termination of the 1988 agreement and specifically looked at "statutes regarding fair treatment of dealers." (Ex. V.) He also represented Sound of Music in its agreements with Muzak and DMX. (Ex. J at 9.) In light

---

[5]This impression is created in ¶ 3 of the affidavit, which states: "Affiant has represented Sound of Music in various transactions in relation to the negotiation of contracts with [3M] *as far back as 1995.*" (Ex. 42; emphasis added.) In fairness to Josephson, in his deposition, he did state that his representation went back at least to 1993 and "possibly" earlier than that. (Ex. J at 7.)

of all these facts, it is simply not credible for Josephson to claim that he could not have

discovered these fees in November and December 1997.  Moreover, given that the other

attorneys at Josephson's firm discovered these fees sometime around April 1998 (Ex. 42. at ¶¶

11-12), Sound of Music still had approximately seven months before the limitations period

expired.[6]

### D.       The Minnesota Franchise Act (Count II).

3M also raises numerous arguments for granting judgment on the Minnesota franchise act

claim.  It argues that (i) the Minnesota Act cannot be applied extraterritorially to an Illinois

corporation working in Illinois that only had *de minimus* sales in Minnesota; (ii) that Sound of

Music waived its franchise claim in the 1995 agreement; (iii) that there is no franchise fee; and

(iv) and that the termination meets the good cause requirement.

We begin with the waiver argument, finding it dispositive.  It is undisputed that the 1995

agreement contains a clause explicitly stating that Sound of Music is not a franchisee.  *See* Ex. B

at § 4.0.  The only issue is whether the Minnesota Act contains an anti-waiver provision that

would preclude the application of this clause.  As 3M demonstrated in its opening brief, the

Minnesota statute does contain an anti-waiver provision but it is limited to Minnesota

franchisees:

---

[6]As an alternative argument, Sound of Music argues that the limitations period did not
begin running until April 1998 because it was only at that point that Sound of Music realized that
it was damaged when Cushing sold the business to Muzak for less than what he thought was its
fair value.  We are not persuaded by this argument or the cases cited in support of it. If true, this
argument would give Sound of Music the freedom to sit around for an open-ended time period,
waiting to see if a better alternative came along.

> Any [] provision . . . purporting to bind any person who, at the time of acquiring the franchise is a resident of this state . . . or purporting to bind a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of Sections 80C.01 to 80C.22 or any rule or order thereunder is void.

Minn. Stat. § 80C.21.

It is undisputed that Sound of Music is neither a Minnesota resident nor a "franchise to be operated" in Minnesota. Based on this straightforward reading of the statute, this anti-waiver provision does not apply here, and Sound of Music therefore waived any rights under the Act. This is the same conclusion reached in *Bixby's Food Systems, Inc. v. McKay*, 193 F.Supp.2d 1053, 1063 (N.D. Ill. 2002), which involved similar facts as this case. Sound of Music did not even attempt address this argument in its response brief. For the above reasons, we find that this claim has been waived.

### III.    Motion For Leave To File A Second Amended Complaint.

From the beginning of this lawsuit, Sound of Music has advanced its enticement theory. This theory was a significant part of the original complaint filed in 1999, which stated that Sound of Music relied on 3M's oral and written statements that "it was committed to the [background music] business well into the 21st century." (Cmplt. ¶ 11-12.) This theory was again featured prominently in the amended complaint. (Am. Cmplt. ¶¶ 11-12.) Yet, neither of these complaints contained a cause of action that specifically incorporated this theory. Instead, like the duress theory, this theory lingered in the background as Sound of Music apparently could not find a viable cause of action.

However, after the close of discovery and two weeks before the date set for the filing of 3M's summary judgment motion, Sound of Music claimed that it had found a viable cause of

action by linking this enticement theory to its newly-developed fraud allegations. It filed a motion for leave to file a second amended complaint that would add a claim under the Illinois Consumer Fraud and Deceptive Trade Practices Act (the "Consumer Fraud Act").

3M opposes this motion both on procedural grounds (it was filed too late) and on substantive grounds (no evidence to support the claim). 3M argues that this motion was filed after discovery and could have been filed much earlier. Sound of Music states that it only discovered evidence of the fraud recently and that it is not asking for additional discovery and is willing to rely on the voluminous evidence it has already submitted with its summary judgment response brief. Although we agree that Sound of Music waited too long to file this motion, we will nonetheless examine the evidence supporting this claim.

To prevail under the Consumer Fraud Act, Sound of Music claims that it need only prove that 3M intentionally engaged in deceptive or misleading act that was designed to induce reliance by Sound of Music. Sound of Music touts this claim as one that can exist "notwithstanding any other agreements" and "even if [Sound of Music] was not justified in believing 3M." (Mot. at 3.) Although Sound of Music wants to bypass the issue of reliance and to ignore the fact that there is an express contract governing the same subject matter, it is worth making clear what Sound of Music implicitly concedes in the above statement, which is that its purported reliance on these statements was unreasonable as a matter of law primarily because these statements were in stark contradiction to the terms of the parties' written contract.

Take the oral statement first. Cushing claims that, despite the time and energy everyone devoted to negotiating the terms of the 1995 agreement, he was really relying on a statement by someone at 3M who said "don't worry" about the contract because it was "just some legal

matter." As an experienced businessmen who regularly consulted counsel and as one who was suspicious of 3M's ultimate commitment to this business, Cushing knows that this "trust me" approach was not reasonable. If it were, it would mean that the year and a half negotiations leading up to the 1995 agreement were largely a meaningless exercise.[6]

For the same basic reason, Sound of Music was not justified in relying on the promotional statements. How could Sound of Music reasonably believe that the agreement would last until 2005 when the agreement itself stated in unequivocal terms that 3M could exit the business at any time on 12 months' notice *and* that the agreement would last until, *at the latest*, December 31, 1999? When 3M told Sound of Music that it was not willing to agree to a 60-month notice period, this was a clear warning sign. In short, the promotional statements and the written contract were in irreconcilable contradiction. This contradiction related to a material term of the contract. This is not a situation where a party is seeking to have a court to fill a gap that arose because the parties failed to contemplate an issue or where a party is seeking to enforce an oral agreement regarding a side issue that was peripheral to the written contract. In any event, the 1995 agreement contained an integration clause stating that it constituted the "entire contract" between the parties and that any modifications must be in writing. (Ex. B at §

_____

[6]Cushing's claim – that he was willing to rely on 3M's oral promises – is undermined by Exhibit 48, which is one of the exhibits submitted by Sound of Music, albeit for a different purpose. According to this exhibit, Cushing and Shivitz met on June 29, 1992 and reached an oral agreement about certain major accounts. After the meeting, Cushing wrote a letter summarizing the parties' oral agreement and asked Shivitz to sign and return this letter formally acknowledging that 3M agreed to these terms. According to handwritten notes on the bottom of the letter, Shivitz apparently asked Cushing "don't you trust me," and Cushing responded that he still wanted something in writing. This episode shows that Cushing previously was not willing to rely on 3M's oral promises and correctly realized then that he needed to get a written agreement in order to have a legally enforceable promise.

29.0.)  In sum, Sound of Music had no basis for ignoring the written contract and choosing

instead to believe on these statements outside of the contract.  *See generally Cromeens,*

*Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) ("A party is not justified

in relying on representations outside of or contrary to the written terms of a contract he or she

signs when the signer is aware of the nature of the contract and had a full opportunity to read

it."); *Barry Mogul and Assocs. v. Terrestris Dev. Co.*, 643 N.E.2d 245, 251 (Ill. App. Ct. 1994)

("It is well established, as a general rule, that a plaintiff cannot pursue a quasi-contractual claim

where there is an enforceable express contract between the parties."); *Reese Design, Inc. v. I-94*

*Highway 61 Eastview Ctr. Partnership*, 428 N.W.2d 441, 446 (Minn. App. Ct. 1988) ("Where an

express contract exists, there can be no implied contract with respect to the same subject

matter.").

Another problem with Sound of Music's purported reliance on these statements is that

they are essentially marketing statements that were not designed to be enforceable promises.  As

such, they are vague, difficult to enforce, and easily misinterpreted.  3M's statement that it was

prepared to move forward into the 21st century is the type of bland aspirational statement that

almost every business makes at one time or another.  These statements of future intent are

generally not binding and are instead considered to be, in the words of Oliver Wendell Holmes,

"mere[] words of prophecy, encouragement, or bounty, holding out a hope but not amounting to

a covenant."  *Wisconsin & Michigan Railway Co. v. Powers*, 191 U.S. 379, 386 (1903).  3M's

statement that it had signed a satellite contract that was expected to last until 2005 is more

specific but it too falls short of making a clear promise.  For all dealers knew, the satellite

contract could have had an exit-business-clause just as the 1995 agreement did.  Moreover, even

if the statement suggested that 3M was committed to staying in the background music business, that does not necessarily mean that it was committed to staying in business with these particular dealers.  Sound of Music often worried that 3M would decide to sell directly to end users, thereby cutting Sound of Music out of the picture.

Another ambiguous aspect to these statements is that they are unclear about exactly what length of time 3M was supposedly committing itself to.  There are two statements at issue.  What length of time is meant by the phrase "into the 21st century"?  Does that mean one day into the new century or some longer time?  Is this time period different from the year 2005.  If so, how do we resolve the two?  Along this line, we note that, although the 3M statements consistently used the phrase "into the 21st century," Sound of Music has augmented this phrase in its complaint by adding the word "well" in front of it.  *See* Am. Cmplt. ¶¶ 11, 12 (stating that 3M promised to stay in the business until "well into the 21st Century").  The addition of this one word arguably could extend this contract, depending on how one interprets "well," out sometime until the year 2050 or 2075.  The addition of this small but powerful word shows how easy it is for a party believe that these promotional statements are something that they are not.  And this is also why a party asserting a claim for promissory estoppel, which is the cause of action that the enticement theory really is most akin to, must establish that the promise the party was relying on was "clear and definite."  *See Greuling v. Wells Fargo Home Mortgage, Inc.*, 690 N.W.2d 757, 761 (Minn. App. Ct. 2005).

However, as noted above, Sound of Music believes that it can side-step these issues by asserting a Consumer Fraud Act claim.  Even if Sound of Music is correct on this point, it still faces a separate and difficult hurdle.  As it concedes, to prevail on this claim, it must prove that

3M made these alleged promises even though it knew they were false when it made them. If, on the other hand, 3M made the statements believing they were true in 1995 but then later in 1997 changed its mind for some reason, then this claim fails.

Let us now consider Sound of Music's evidence on this critical point. Although it has submitted numerous exhibits, it has no direct evidence of any fraudulent scheme. Despite the fact that numerous individuals were involved in these events, Sound of Music has not uncovered testimony from anyone who even suggests that a scheme existed in 1995. All the witnesses testified that 3M made this decision in the latter half of 1997 and that no discussions about discontinuing the business took place in 1995.[7] Sound of Music's case thus rests on the assumption that a number of people have lied in their deposition testimony to cover up this scheme.[8]

Lacking direct evidence, Sound of Music relies on a pretextual approach in which tries to poke holes 3M's official explanation for why and when it decided to exit the business. However, as explained below, these arguments are scattershot, attenuated, often based on inadmissible evidence, and not connected together into any coherent larger framework.

---

[7]*See* Ex. H at 18, 104 (Will testified that no discussions took place until after Roese left to go to Europe in the late summer of 1997 and that neither he nor anyone on his team consulted with any previous project managers); Ex. F at 22-28 (Shivitz never discussed discontinuing the business with Sabongi or anyone else, and he couldn't recall ever seeing any correspondence discussing the issue); Ex. G at 15 (Sabongi only became involved in this business in the latter half of 1997).

[8]Sound of Music repeatedly states in its brief, for example, that Will is lying. Yet, in his deposition, Cushing stated that Sound of Music had a "[v]ery, very good relationship and close relationship" with Will. (Ex. A at 30.)

First, Sound of Music claims that 3M has given a contradictory explanation of who made the *final* decision to exit the business because (i) 3M stated in an interrogatory answer that Sabongi made the decision and because (ii) Sabongi testified that he merely made a recommendation that was acted upon by someone higher up in the corporation. Sound of Music says that 3M can't get its story straight and believes this discrepancy shows that Sabongi and also Will are lying when they claim that the decision was made in 1997.

This argument is unconvincing. For one thing, 3M's interrogatory answer is more nuanced than Sound of Music portrays it. 3M actually stated that Sabongi made the decision "with approval of the operating committee." *See* Ex. 26 at ¶ 5. So this discrepancy is really a quibble at best. For another thing, what difference does it make if the decision was made either by Sabongi or someone higher up? Sound of Music does not offer any explanation. We fail to see how this supposed discrepancy is linked to a fraudulent scheme.

Second, Sound of Music finds it suspicious that the only document 3M produced in discovery relating to the 1997 decision is the Will report. Why aren't there more documents? In his deposition, Will explained that his team purposefully tried to keep the decisonmaking process a secret, by limiting the amount of paperwork and by instead discussing issues in meetings, in order to avoid the inevitable "rumor mill issues" that would arise if others in the company were aware of the pending decision. (Ex. H at 71.) This point is confirmed by the fact that, only a few days before the Will report was submitted, employees were continuing to meet and make preparations for the future operation of this business. (Ex. 30.) Will's explanation is reasonable on its face. Sound of Music has not presented any evidence that would show that this approach was outside of 3M's normal operating procedures in these types of situations.

Third, Sound of Music asserts that, although the Will report was written in November 1997, it was based on an assumption that the business would be shut down at some point and that the only question was one of timing. Therefore, it asserts that 3M made a "pre-existing" decision to shut down the business. To buttress this argument, Sound of Music relies heavily on a letter that it believes "clearly torpedos" 3M's official explanation by proving that the decision had already been made before the report and that further "makes clear" that both Sabongi and Will are lying. (Resp. at 11.)

This letter is a September 16, 1997 letter from Michael Malone, who is listed as the CEO of AEI Music Network, to Merrill Johnson. Because Sound of Music regards this letter as one of its strongest pieces of evidence establishing the fraudulent scheme, we will consider it carefully. The letter states, in pertinent part, as follows:

> As you may recall, from time to time we have inquired of 3M as to their long term commitment to the Background Music Industry.
>
> Over the last couple of years, we've stayed in touch with Arnie Roese, exploring potential joint agreements and compatibility of resources.
>
> I understand Arnie has gotten a promotion (well deserved, I might add), possibly leaving open the opportunity of AEI and 3M to discuss a mutual future. We are buyers, not sellers, Merrill. But I do believe, AEI could well serve some of the interests 3M may choose to retain.

(Ex. 28.) Sound of Music relies on the last phrase – "interests 3M may choose to retain" – and infers from it that 3M must have told AEI that it was getting out of the background music business.

This argument fails on multiple levels. To begin with, this letter, like a number of the other exhibits submitted by Sound of Music, is hearsay and inadmissible. We have no testimony from Malone or Johnson and no context in which to interpret this letter. Its meaning is not by

any means self-evident.  Was it merely a periodic fishing expedition from a competitor as is suggested by the first sentence?  The letter mentions twice the possibility of a joint future, which does not suggest that 3M was shutting down the business.  Likewise, the reference that "we are buyers, not sellers" suggests that AEI was not sure what 3M was doing with this business, a point that is also supported by the word "may" in the last sentence.

Focusing on the last phrase upon which Sound of Music relies, its meaning is likewise ambiguous.  In particular, what is meant by "some of" the interests 3M may retain?  Sound of Music says that this phrase indicates that 3M was considering "what portions" of the background music to retain.  (Resp. at 11.)  This would suggest that 3M was contemplating splitting the background music business into parts and retaining only some of them.  But there is absolutely no evidence anywhere in the record to suggest that 3M ever considered such an option.  Using this language would be an odd way to refer to a decision to exit an *entire* business.

A more plausible interpretation of this last sentence is that this letter was written in response to 3M's announcement that it was selling its National Advertising division (of which the background music business was one part) and that Malone was not sure whether the background music would be a part of that sale or would be retained.  This interpretation also would explain why the letter was addressed Merrill Johnson at "3M National Advertising."

But even giving Sound of Music the benefit of the doubt and putting aside these evidentiary and interpretative problems, Sound of Music's reliance on this letter faces a more fundamental problem.  Sound of Music repeatedly states in its brief that 3M made a "pre-existing" decision to exit the business (by which it simply means a decision made *anytime* before October 21, 1997) without then going on to explain *exactly when* that decision was supposedly

made.  But this argument overlooks the fact that fraud supposedly took place in 1995 or before.  At best, the Malone letter shows that a decision had been made sometime around September 1997.  This letter thus does not contradict 3M's claim that the decision took place sometime in the two month period before the letter.  The termination letter itself states that the decision had been under consideration for "several months."

Fourth, Sound of Music asserts that 3M has failed to produce any of its five-year or yearly business plans even though such plans supposedly existed through 1997.  Specifically, Sound of Music relies on Cushing's statement in his affidavit that Dave Bzoski stated at a dealer meeting in 1995 that 3M had "just completed [its] 5 year plan and that portions of that plan would be made available to the Dealers."  (Aff. at ¶ 16.)  Once again, Sound of Music's evidence is hearsay and thus there is no admissible evidence that a five-year plan ever existed.  So we cannot infer any negative inference from the failure to produce a document that may not have existed.

Fifth, as one of its main arguments, Sound of Music asserts that the 1997 decision makes no sense from a business perspective.  Stated in simple terms, the argument is that no one would rationally shut down a profitable business such as this one.  This argument rests on two underlying assertions:  (i) the business was profitable in 1997, and (ii) fears about digital technology were unwarranted.  This argument fails, however, because it overlooks the specific reasons for why 3M decided to exit the business and also fails to appreciate the fundamental differences between these two companies.

The first underlying assertion, which is not disputed by 3M, does not cast doubt on 3M's explanation.  As the Will report makes clear, 3M's decision was not based on a belief that the

business was *currently* unprofitable in 1997 but on a belief that it would become unprofitable in the *future* – specifically whether it could sustain profitability until 2005 and even for 10 to 15 years beyond that time as would have been required by a new long-term satellite contract. Based on that conclusion and considering other factors, 3M concluded that it was better to shutdown immediately.

This strategy of preemptively shutting down a currently profitable business because its competitive position eventually will erode over time is not illogical nor uncommon, and is specifically described on 3M's website as a part of its governing philosophy:

> Many say the company's success over the years is linked to its ability to change as 3M, its products and the world market place evolves. In fact, when the company greeted the new century in 2000, more than half the businesses that were 3M staples 20 years before had disappeared from the corporate portfolio. On the surface eliminating a product, even a division or more, might seem an admission of failure in business. But, that analysis would be superficial and incomplete. Over the years, 3M has worked to make its own products obsolete before its competition does – or the protection of crucial patents expires. 3M also has acquired companies with an eye on strengthening a core business. Some of these acquisitions have succeeded, while others have failed to yield the expected product synergy or financial returns.

*A Century of Innovation*, at pp. 199-200.

Moreover, profitability was not the sole criterion for the decision. We know from the report and from Will's testimony that 3M considered other factors, including the availability of escrow funds, the risk that dealers would switch to competitors, and the relationship of this business to the intercom business. In fact, the termination letter does not mention profitability but instead states that the decision was based on a "change in strategic business direction." (Ex. M.)

As explained in the above quotation from 3M's website, product synergy was an ongoing strategic concern for 3M. In 1991, 3M cited product synergy as the reason for moving the background music business within National Advertising division. In 1997, 3M sold the National Advertising division, even though it was producing "strong revenues" at the time, because it failed to achieve the hoped-for product synergy. A concern over product synergy is thus a reasonable and likely explanation for why Richardson asked Sabongi in the fall of 1997 to look into the health of the background music business. This request was made at the time National Ad was sold. We know that this sale left the background music business adrift with no natural place in the company. It was temporarily placed in the Food Services division even though, as Sabongi testified, it "did not relate to food service at all." (Ex. G at 16.) Also, 3M's original reason for entering into this business, which was that it was a natural extension of its strength in tapes, no longer existed after the industry quit using magnetic tapes to distribute the music.

In asserting that 3M's decision was irrational, Sound of Music overlooks the fundamental asymmetry between these two companies. 3M is an extremely large diversified company with billions in revenues and more than 55,000 products. The background music business was by any objective measure an extremely small part of this company, and one that did not fit naturally within the company's product lines in 1997. For 3M, it therefore may have made sense to preemptively shut down this business and shift resources to other products that had better long-term outlooks and that fit more naturally within the company's existing product lines. Sound of Music, on the other hand, was essentially a one-product company that had not diversified in any significant manner. It therefore may have had less flexibility to shift its resources elsewhere and

therefore may have been more willing to forge ahead and assume the risks that 3M was unwilling to assume.[9]

Sound of Music's second underlying assertion – that 3M irrationally was worried about the emerging digital technology – also fails to undermine 3M's explanation. The only evidence for this assertion is Cushing's statement in his 2003 affidavit that the technology in the industry "remains predominantly analog technology." No other objective evidence has been submitted to support this statement. But even assuming Cushing's statement is true, it would only speak to the state of affairs in 2003. It does not prove that, in 1997, 3M's fear of digital technology was irrational. In fact, according to one of Sound of Music's own exhibits, dealers in 1995 had a similar concern and were asking 3M whether their analog equipment would be "outdated soon." (Ex. 13 at p.3.) Will testified that 3M's competitors had similar concerns. Moreover, given the earlier technological shifts in this industry, it would not have been irrational to fear yet another one.

Although Sound of Music devotes most of its argument to trying to find inconsistencies in 3M's 1997 explanation, it makes no real effort to explain how this scheme was created and implement. There are a number of unanswered questions. Who came up with this scheme? When? What was the motive? How was this scheme communicated throughout the organization over the years? Putting aside the missing operational details, why would 3M enter into a binding commitment with the satellite provider until year 2005, with no clause allowing for early

---

[9]However, it is worth noting that, after 3M exited the business, Sound of Music had the opportunity to take over this business from 3M but that it ultimately concluded after analyzing all the relevant facts that the venture would be "too risky" without 3M's presence. This conclusion suggests that the future prospects of this business were not as certain or risk-free as Sound of Music has suggested.

termination, if it knew that it would be exiting the business in 1997? This does not sound like the well-developed strategy that Sound of Music claims it was.

Sound of Music has several other arguments, but we will not discuss them as they are weaker than the above arguments. In sum, it is clear that Sound of Music has not come forward with sufficient evidence that would allow a reasonable factfinder to conclude that 3M made a pre-existing decision in 1995 to exit this business, which is the linchpin of its proposed Consumer Fraud Act claim. Accordingly, the filing of the proposed second amended complaint would be a futile act.

## **CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment is granted and judgment is granted to the defendant on all counts. The motion for leave to file a second amended complaint is denied. This is a final judgment.

**ENTER:**

*John A. Nordberg*

**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** September 27, 2005